**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| TERRY LEE WILCOX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Cause No.: 1:05-CV-107 |
| | ) | |
| CSX TRANSPORTATION, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OF OPINION AND ORDER**

This matter is before the court for resolution of several pending motions.  Defendant CSX

Transportation, Inc., ("CSX" or "defendant") filed a motion for summary judgment on February

16, 2007.  Plaintiff Terry Lee Wilcox ("Wilcox" or "plaintiff") filed a response in opposition to

the motion on March 16, 2007, and CSX filed a reply brief on March 27, 2007.  In addition,

Wilcox filed two motions in limine and CSX filed one such motion.  Briefing on the motions in

limine was completed on March 28, 2007.

For the reasons discussed in this Order, the motion for summary judgment is DENIED;

Plaintiff's motion in limine to limit the testimony of David Nieman is GRANTED in part and

DENIED in part; Plaintiff's motion in limine to limit the testimony of Stephen Messier is

GRANTED in part and DENIED in part; and Defendant's motion in limine to exclude the

testimony of Robert Andres and Rodney Stuck is GRANTED in part and DENIED in part as to

Andres, and DENIED as to Stuck.

**I.  FACTUAL BACKGROUND**

Terry Wilcox was employed by CSX as a brakeman/conductor beginning on March 15,

1974.  Amended Complaint, Docket at 29, ¶ 7.  He continued in that position until September

2004, at which time he "was deemed medically disqualified from his craft as a brakeman as [a] result of the foot injuries which are the subject of this lawsuit."  Plaintiff's Memorandum in Response to Defendant's Motion for Summary Judgment ("Plaintiff's Response"), Docket at 63, p. 6.  In his Complaint, Wilcox asserts three claims against CSX.  In Count I, Wilcox alleges that CSX is liable to him under the provisions of the Federal Employers' Liability Act ("FELA"), 45 U.S.C. § 51 *et seq*., for personal injuries Wilcox claims he sustained during the course of his employment.  More specifically, Wilcox claims in Count I of his Complaint that "railroad 'ballast' was used by the defendant to support the railroad tracks and track structures owned, maintained and used by the defendant in areas where the plaintiff was required to perform his assigned duties."  Amended Complaint, ¶ 8.  Wilcox states that CSX used "large, oversized ballast" which caused injury to Wilcox over time.  *Id*., ¶ 11.  Wilcox claims that he developed "injury over time from working on ballast that was large, oversized, loose, untamped or otherwise unsuitable for the assigned duties of a brakeman/conductor."  *Id*., ¶ 13.  Wilcox claims that he "developed physical injuries that were caused by the cumulative effect of working on ballast that was large . . . and otherwise unsuitable for use as a walking surface while performing the duties of a brakeman/conductor for the defendant."  *Id*., ¶ 20.  According to Wilcox, he developed serious foot injuries as a result of having to perform his duties on this large ballast (as opposed to smaller sized ballast).[1]  Plaintiff's Response, p. 6.  He seeks $750,000.00 in

---

[1] CSX describes Wilcox's claim as being based on an allegation that he "had to walk on 'mainline' ballast rather than 'yard' ballast, causing him to develop plantar faciitis."  Defendant's Memorandum in Support of Motion for Summary Judgment ("Defendant's Memorandum"), Docket at 57, p. 1.  As Wilcox explains it, "'[b]allast' are rocks used by railroads on the surface of their railroad yards.  In general, large rocks . . . are used along mainline tracks.  In contrast, small rocks often referred to as 'walking ballast' are used within railroad yards where employees are often required to walk."  Plaintiff's Response, p. 1, n. 2.

compensation from CSX for these injuries.  Amended Complaint, ¶ 22.

     The pertinent Federal Employers' Liability Act section provides:

> Every common carrier by railroad while engaging in commerce between any of the several states or Territories, ... shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, ... for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

45 U.S.C. § 51.

     As stated above, Wilcox asserted three separate claims against CSX in his Amended Complaint.  However, by way of its present motion for summary judgment, CSX seeks judgment as a matter of law only on Count I of the Amended Complaint (the so-called "ballast claim").  See Defendant's Reply Memorandum in Support of its Motion for Summary Judgment ("Defendant's Reply"), Docket at 71, p. 1, n. 1 ("Plaintiff is correct that CSXT has moved for summary judgment with respect to only Count I of Plaintiff's Complaint.  Should summary judgment be granted, Counts II and III would remain[.]").  Thus, it is not necessary to set forth the factual background relating to Wilcox's other counts in his Complaint.

     In its motion for summary judgment, CSX alleges that it is entitled to judgment in its favor on Count I of Wilcox's Complaint because the claim is precluded by the provisions of the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20101 *et seq*., which was enacted by Congress in 1970.  Defendant's Memorandum, p. 2.  According to CSX, the Federal Railroad Administration ("FRA"), which "regulates rail safety, including employee safety . . . ," is

---

Thus, in layman's terms, Wilcox claims his injuries were caused by having to walk and work on surfaces made from large rocks rather than surfaces constructed from smaller, more compacted rocks.

responsible for promulgating and enforcing rules and regulations for "railroad employee safety" including "track, roadbed, and associated devices and structures" such as the ballast surfaces at issue in the present motion. *Id.* Consequently, according to CSX, Wilcox's common law claim for personal injuries is precluded by the FRSA. *Id.*, pp. 12-13.

## II.  DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### A.  Summary Judgment Standard.

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). However, Rule 56(c) is not a requirement that the moving party negate his opponent's claim. *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and in which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552-53 (1986). The standard for granting summary judgment mirrors the directed verdict standard under Rule 50(a), which requires the court to grant a directed verdict where there can be but one reasonable conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505, 2511 (1986). A scintilla of evidence in support of the non-moving party's position is not sufficient to successfully oppose summary judgment; "there must be evidence on which the jury could reasonably find for the plaintiff." *Id.* at 2512; *In Re Matter of Wildman*, 859 F.2d 553, 557 (7th Cir. 1988); *Klein v. Ryan*, 847 F.2d 368, 374 (7th Cir. 1988); *Valentine v. Joliet Township High School District No.*

*204*, 802 F.2d 981, 986 (7th Cir. 1986).  No genuine issue for trial exists "where the record as a whole could not lead a rational trier of fact to find for the nonmoving party." *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992) (quoting *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986)).

Initially, Rule 56 requires the moving party to inform the court of the basis for the motion, and to identify those portions of the "pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S. Ct. at 2553.  The non-moving party may oppose the motion with any of the evidentiary materials listed in Rule 56(c), but reliance on the pleadings alone is not sufficient to withstand summary judgment.  *Goka v. Bobbitt*, 862 F.2d 646, 649 (7th Cir. 1988); *Guenin v. Sendra Corp.*, 700 F. Supp. 973, 974 (N.D. Ind. 1988); *Posey v. Skyline Corp.*, 702 F.2d 102, 105 (7th Cir.), *cert. denied*, 464 U.S. 960 (1983).

In ruling on a summary judgment motion the court accepts as true the non-moving party's evidence, draws all legitimate inferences in favor of the non-moving party, and does not weigh the evidence or the credibility of witnesses.  *Anderson*, 477 U.S. at 249-251, 106 S. Ct. at 2511.  However, "[i]t is a gratuitous cruelty to parties and their witnesses to put them through the emotional ordeal of a trial when the outcome is foreordained" and in such cases summary judgment is appropriate.  *Mason v. Continental Illinois Nat'l Bank*, 704 F.2d 361, 367 (7th Cir. 1983).

Substantive law determines which facts are material; that is, which facts might affect the outcome of the suit under the governing law. *Id.* 477 U.S. at 248, 106 S. Ct. at 2510. Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute. *Id.* The issue of fact must be genuine. Fed. R. Civ. P. 56(c), (e). To establish a genuine issue of fact, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356; *First National Bank of Cicero v. Lewco Securities Corp.*, 860 F.2d 1407, 1411 (7th Cir. 1988). The non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Id.* A summary judgment determination is essentially an inquiry as to "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-252, 106 S. Ct. at 2512.

**B. Discussion.**

The issue before the court is whether Wilcox's personal injury claim is preempted by the FRSA. As CSX points out, the FRSA was enacted by Congress for the purpose of establishing "uniform and comprehensive rail safety regulation" and to 'promote safety in every area of railroad operations and reduce railroad-related accidents and incidents.'" Defendant's Memorandum, p. 2 (quoting 49 U.S.C. § 20103(a)). CSX also points out, correctly, that "[t]he Secretary of Transportation regulates rail safety . . . through the Federal Railroad Administration." *Id.* As a result of this attempt by Congress to establish national uniformity in the area of railroad safety regulation, the FRSA precludes many common law causes of action by railroad employees. *See, e.g., CSX Transportation, Inc. v. Easterwood*, 501 U.S. 658 (1993) (plaintiff's common law personal injury claim based on train's alleged excessive speed was

preempted by FRSA); (*Waymire v. Norfolk & Western Railway Company*, 218 F.3d 773 (7th Cir. 2000)) (same).  CSX cites numerous cases that it states stand for the proposition that a "FELA claim cannot impose greater requirements upon a railroad in an area already covered by FRA safety regulations."  Defendant's Memorandum, p. 6.  CSX argues that in the present case, Wilcox is seeking to impose on CSX a greater duty of care than is already imposed on the railroad by the FRA in its Track Safety Standards.  Accordingly, defendant argues, Wilcox's claim is preempted.  *Id*.

CSX bases its argument primarily on the "Track Safety Standards" promulgated by the FRA and found in 49 C.F.R. § 213.1 *et seq*.  Specifically, CSX points to § 213.103 of the FRA "Track Safety Standards," which the company claims "governs the 'minimum requirements' for ballast[.]" *Id*., p. 3.  That section states as follows:

§ 213.103 Ballast general.

> Unless it is otherwise structurally supported, all track shall be supported by a material which will
> (a) Transmit and distribute the load of the track and railroad rolling equipment to the subgrade;
> (b) Restrain the track laterally, longitudinally, and vertically under dynamic loads imposed by railroad rolling equipment and thermal stress exerted by the rails;
> (c) Provide adequate drainage for the track; and
> (d) Maintain proper track crosslevel, surface, and alignment.

Based on those federal regulations, CSX argues as follows:

> In this case, plaintiff contends that defendant had a higher duty than the one prescribed by the applicable safety regulations based on the assertion that it used improperly sized ballast in its walkways at Garrett Yard.[2]  However, the FRA has clearly evidenced an intent to occupy the field of safety regulation of ballast completely, and any assertion of a higher or different duty on the part of CSXT

---

[2]  The Garrett Yard is located in Garrett, Indiana, and is the location where Wilcox was employed.

must fail.

Defendant's Memorandum, p. 4.  CSX also notes that "[t]he Secretary [of Transportation] has

explicitly noted in 49 C.F.R. § 213.2 that C.F.R. rules have a preemptive effect.  49 C.F.R. §

213.2 states as follows: 'Under 49 U.S.C. § 20106, issuance of these regulations preempts any

State law, regulation, or order covering the same subject matter, except an additional or more

stringent law, regulation, or order that is necessary to eliminate or reduce an essentially local

hazard, is not incompatible with a law, regulation, or order of the United States government; and

that does not impose an unreasonable burden on interstate commerce.'" *Id*., p. 7.

In further support of its argument, CSX cites several cases that it claims address the issue

of preemption as it applies to track beds and walkways.  *Id*., pp. 10-11 and 12 (citing *Norfolk &*

*Western Railway Company v. Burns, et al.*, 587 F.Supp. 161 (E.D. Mich. 1984)) (attempts by

State of Michigan to impose regulations on trackside walkways was preempted by FRA Track

Safety Standards); *Missouri Pacific Railroad Co. v. Railroad Commission of Texas*, 823 F.Supp.

1360 (W.D. Tex. 1990) (same); *Black v. Seaboard System Railroad*, 487 N.E.2d 468

(Ind.Ct.App. 1986) (State requirement that railroads construct walkways along tracks for use by

railroad employees held to be preempted by FRA regulations).  In addition to these cases, CSX

cites the case of *Norris v. Central of Georgia R.R. Co.*, 635 S.E.2d 179 (Ga.App. 2006), a

Georgia state court case, which CSX maintains is "directly on point."  Defendant's

Memorandum, p. 12.  In the *Norris* case, the plaintiff brought an action under FELA for personal

injuries he sustained as a result, he claimed, of the railroad's failure to use "yard" ballast instead

of "mainline" ballast in the area where he was working.  The Georgia Court of Appeals held that

plaintiff's claim was preempted, reasoning that "[t]o the extent that [plaintiff's] FELA claim

rests upon different ways by which [the railroad] might have supported the mainline track to comply with 49 C.F.R. § 213.103, the negligence claim is precluded.  The fact that the regulation does not specify any size for the various purposes of the ballast does not alter the fact that the regulation nonetheless 'covers' or 'substantially subsumes' the subject matter of a ballast selection relative to track maintenance."  CSX argues that "[Wilcox's] negligence claim here, as the plaintiff's claim in *Norris*, should be dismissed as it is precluded by federal law."  *Id.*

In his response in opposition to defendant's motion for summary judgment, Wilcox argues that the preemption cases cited by CSX in support of its position do not carry the day in this case.  Plaintiff's Response, p. 2.  Wilcox agrees that "[t]he issue in FELA cases is whether a FELA case is 'precluded' or 'superseded' by the FRSA."  *Id.* (citing *Waymire v. Norfolk & Western Railway Company*, 218 F.3d 773 (7th Cir. 2000)).  In the present case, Wilcox argues that his claim is not, as CSX contends, preempted by the FRSA.  In support of his argument, Wilcox relies primarily on a prior decision of this court in the case of *DeGrasse v. CSX Transportation, Inc.*, which he states "addressed the exact 'preclusion' issue which CSXT against presents in this case."  *Id.*  Furthermore, Wilcox argues that the factual scenario (as well as the legal analysis) presented in *DeGrasse* is directly on point with the present case and should, therefore, be controlling.

In the *DeGrasse* case (an unpublished decision of this court which was issued in Case No. 1:00-CV-55), the plaintiff was a brakeman/conductor who worked for CSX.  He brought a FELA action against the defendant seeking to recover damages for personal injuries he sustained as a result of having to walk on large ballast (as opposed to smaller yard ballast) during his years of employment.  DeGrasse alleged that having to work constantly on large ballast rendered him

totally disabled as a result of foot and ankle injuries.  Wilcox argues that "[t]he case at bar is identical to *DeGrasse*.  It involves the same railroad yard, the same ballast, the same time periods, the same experts, the same pictures, the same site inspections and the same Defendants." Plaintiff's Response, p. 4.  Indeed, DeGrasse, like Wilcox, was employed as a brakeman/conductor for CSX, worked in the company's Garrett site during approximately the same time Wilcox did, and sustained injuries for an allegedly similar reason (i.e., having to walk on large ballast over a long period of time).  In *DeGrasse*, this court held that the plaintiff's claim was not preempted by the FRSA, since the pertinent language of the FRA's Track Safety Standards (49 C.F.R. § 213.103) contained no language whatsoever stating (or even implying) that those regulations were intended to provide standards for employee safety.  Instead, DeGrasse argued "that the regulation cited [ ], while pertaining to ballast, does not cover the subject matter of *employee safety* with respect to ballast.  Rather . . . the regulation merely prescribes minimum safety requirements for the roadbed, track geometry and track structure, without addressing the issue of what size ballast satisfies the regulation and also can provide reasonably safe walking conditions for trainmen performing switching operations in the yard." *DeGrasse*, Case No. 1:00-CV-55, Docket at 24, p. 6 (emphasis in original).  That is precisely the position Wilcox takes in the present case.

In deciding the preemption issue in *DeGrasse*, this court held that DeGrasse's case was "remarkably similar to *Grimes v. Norfolk Southern Railway Company*, 116 F.Supp.2d 995 (N.D. Ind. 2000)."  *Id*.  In *Grimes*, Judge Sharp held that the plaintiff's FELA claims were not preempted by the FRSA and that a material issue of fact existed as to whether the railroad was negligent in failing to provide a safe walkway for its employees.  Grimes was also employed as a

brakeman/conductor.  Following a train/car collision, Grimes was walking along next to the train

inspecting for damage.  He stepped in a hole about the size of a basketball and sustained injuries

as a result.  The defendant in that case, as here, claimed that it was in compliance with the Track

Safety Standards (including 49 C.F.R. § 213.103) and therefore plaintiff's claims were

preempted by the FRSA.  In a thorough and studious discussion of the law from the various

circuits regarding FRSA preemption of a negligence claim based on an alleged failure to provide

a safe walkway, Judge Sharp wrote as follows:

> Every circuit that has considered the issue of walkways has concluded that the
> FRSA is silent on the question of walkways.  The regulations are directed toward
> creating a safe roadbed for trains, not a safe walkway for railroad employees who
> must inspect the trains.  In view of the fact that this railroad requires its
> employees to perform numerous trackside inspections of its trains for various
> reasons, this Court declines to find anything in the regulations cited by the
> defendant that precludes this Plaintiff from asserting that the railroad was
> negligent for failing to provide a safe place to walk.
>
> . . .
>
> The defendant . . . has asked this Court to extend *Waymire* well beyond its
> holding to preclude a negligence claim under FELA for any conduct by the
> railroad even remotely covered by a regulation enacted under FRSA.  This Court
> declines the invitation to do so.

*Grimes*, 116 F.Supp.2d at 1002-03.  In the present case (as it did in *DeGrasse*), CSX is pressing

the same argument–and it fails for the same reasons discussed in *Grimes* and *DeGrasse*.  The

regulation at issue–Section 213.103–contains no language about employee safety.  The plain

language of that section makes it clear that it was promulgated for the reasons Judge Sharp

noted, namely, to establish parameters for ensuring that railroad tracks were adequately

supported and provided adequate drainage.  In order to conclude, as CSX urges, that § 213.103

pertains to employee safety, or even that it stands for the proposition that the "FRA has clearly

evidenced an intent to occupy the field of safety regulation of ballast completely . . ."
(Defendant's Memorandum, p. 4), the court would have to read meaning into that regulation that
simply does not appear in the statutory language.  However, it is black letter law that "the normal
rule of statutory interpretation is that plain language governs." *Lexington Ins. Co. v. Rugg &
Knopp,* 165 F.3d 1087, 1091 (7th Cir. 1999); *Newsom v. Friedman,* 76 F.3d 813, 819 (7th Cir.
1996) ("The plain meaning of legislation should be conclusive.").  Even where there may be
some justification for concern about the application of the literal language, "courts cannot re-
write statutes."  *In the Matter of Witkowski,* 16 F.3d 739, 745 (7th Cir. 1994).  The same is true
of the interpretation of federal regulations.  *Time Warner Entm't Co. v. Everest Midwest
Licensee, L.L.C.,* 381 F.3d 1039, 1050 (10th Cir. 2004) (when interpreting a federal regulation, a
court must apply general rules of statutory construction and start with the plain language of the
regulation).

     In its reply brief, CSX acknowledges the *DeGrasse* and *Grimes* decisions[3] but
nonetheless argues that the *Norris* case out of the State of Georgia "supports summary judgment
for [CSX]."  Defendant's Reply Memorandum in Support of its Motion for Summary Judgment
("Defendant's Reply), Docket at 71, p. 4.  Also in its reply brief, CSX cites the case of *Haag v.
CSX Transportation, Inc.*, Case No. 03-048817-NO-2, another state court case.  *Id.* (and Exhibit
A thereto).  In *Haag*, a state court in Michigan concluded that a plaintiff's FELA claim for
personal injury based on a similar ballast issue was preempted by the FRSA.  It is this case, and
the *Norris* case, on which CSX bases its argument.  Notwithstanding this court's decisions in

---

[3] Plaintiff is quick to point out that CSX makes no mention of either *DeGrasse* or
*Grimes* in its memorandum in support of its motion, even though the company was the defendant
in the *DeGrasse* case and the legal issue was the same as the one now before the court.

12

*DeGrasse* and *Grimes*, CSX argues that this court should adopt the reasoning of the state court decisions in *Norris* and *Haag* and eschew its prior holdings in *DeGrasse* and *Grimes*. The reason, according to CSX, is that "there is a split of opinion regarding whether the Track Safety Standards preclude ballast claims such as Plaintiff's, and recent case law holds in the affirmative." Defendant's Reply, p. 3. CSX maintains that "allowing [Wilcox's] lawsuit to proceed would undermine the implementation of national uniform safety standards in the industry and 'undermine Congress's goal of uniform, federal railroad regulation.'" *Id.*, p. 4 (quoting *Norris*, 635 S.E.2d at 183). While CSX is obviously correct in stating that the state court holdings in *Norris* and *Haag* are at odds with this court's holdings in *DeGrasse* and *Grimes* (as well as other federal court decisions as discussed by Judge Sharp in *Grimes*), the court is not persuaded by CSX's argument that it should now reverse course on this issue. Once again, the plain language of § 213.103 does not state, expressly or by implication, that the regulation was intended to provide for the safety of railroad employees, or that it was promulgated by the FRA with a clear "intent to occupy the field of safety regulation of ballast completely[,]" as CSX contends. The current "split of authority" on this issue is one that properly should be resolved by Congress and/or the FRA, by amending the language of § 213.103 to clarify its scope and intent. For purposes of this case, however, CSX's arguments are rejected and its motion for summary judgment is DENIED.

### III.  PLAINTIFF'S MOTION IN LIMINE TO LIMIT THE TESTIMONY OF DAVID NIEMAN, PH.D.

Wilcox has filed a motion in limine seeking to limit the testimony of David Nieman, an expert retained by CSX. Wilcox states that "Nieman is a professor of Health and Exercise Science at Appalachian State University . . . [but that the] various opinions offered by Nieman do

not satisfy the standards of admissibility in federal courts as dictated by Fed.R.Evid. 702 and

*Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny."  Plaintiff's

Memorandum in Support of Motion in Limine to Limit the Testimony of David Nieman, Ph.D.,

Pursuant to Fed.R.Evid. 702 ("Plaintiff's First Motion in Limine"), Docket at 53, pp. 1-2.

Wilcox claims that Nieman should be barred from offering the following opinions:

>  a.  Any opinion relating to the medical "cause" of Plaintiff's injuries;
>  b.  Any opinion criticizing the medical opinions of Plaintiff's treating physicians
>  or retained medical expert physician;
>  c.  Any opinion calling into question Plaintiff's testimony that he walks 3-10
>  miles per day as a utility brakeman for Defendant in its Garrett yard in Garrett,
>  Indiana; and
>  d.  Any opinion that Plaintiff possessed the "risk factor" of limited or restricted
>  dorsi-flexion of the foot and/or ankle prior to his diagnosis of plantar faciitis.

*Id.*, p. 2.  Wilcox expressly states that he "does not submit that Nieman's testimony should be

barred altogether, but only that his testimony be limited in the above requested fashion."  *Id.*

The crux of Wilcox's objection to the above-listed opinions of Nieman is that Nieman is

not a medical doctor, as he admitted in his deposition.  *Id.*, p. 3 (citing Plaintiff's Exhibit B,

Deposition of David Nieman).  Furthermore, Wilcox maintains that Nieman arrived at his

opinions after having conducted "computer research on various risk factor relationships and

causes of foot pain, specifically plantar faciitis. . . . Nieman did research on his computer, read

the research, and is now scheduled to testify as to his findings of the risk factors associated with

and causes of the foot injuries sustained by Plaintiff . . . ."  *Id.*, p. 2.

It is well established that the admissibility of expert testimony in federal court is

governed by Fed.R.Evid. 702 and the holdings contained in *Daubert* and its progeny.  Rule 702

states:

If scientific, technical, or other specialized knowledge will assist the trier of fact

14

> to understand the evidence or to determine a fact in issue, a witness qualified as
> an expert by knowledge, skill, experience, training, or education, may testify
> thereto in the form of an opinion or otherwise, if (1) the testimony is based upon
> sufficient facts or data, (2) the testimony is the product of reliable principles and
> methods, and (3) the witness has applied the principles and methods reliably to
> the facts of the case.

Fed.R.Evid. 702.  Pursuant to the Supreme Court's holding in *Daubert*, a trial court "must act as

a gatekeeper under Rule 104(a) and determine "whether the expert is proposing to testify to (1)

scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in

issue." *Daubert*, 509 U.S. at 592.  To assist the courts in making such a determination, the

Supreme Court identified a non-exhaustive list of factors that can be applied in such instances.

These include: (1) whether the theory or methodology of the proposed expert has been or can be

tested; (2) whether the theory or methodology has been subjected to peer review; (3) whether the

theory or methodology has a known or potential rate of error; and (4) whether the theory or

methodology has been generally accepted in the scientific community.  *Id.* at 593-94.

Wilcox argues that Nieman should be prohibited from testifying about his opinion as to

the cause of plaintiff's alleged injuries since Nieman is not a medical doctor.  Plaintiff's First

Motion in Limine, p. 6.  In support of his position, Wilcox cites *Jones v. Lincoln Electric Co.*,

188 F.3d 709 (7th Cir. 1999) and *Stutzman v. CRST, Inc.*, 997 F.2d 291 (7th Cir. 1993).  *Id.*  In

*Jones*, the Seventh Circuit held that "a witness who had a mechanical engineering degree but

who lacked a medical degree or medical training was not qualified to give expert testimony on

medical questions about the effects of manganese and manganese fumes on the human body."

*Id.* (summarizing the holding in *Jones*).  In *Stutzman*, the appellate court affirmed the trial

court's decision barring a physical therapist from offering a medical prognosis for the long-term

effects of physical therapy on the plaintiff's ability to return to work.  The Seventh Circuit held

15

that the witness was unqualified to render such medical opinions.

CSX opposes Wilcox's motion in limine. Defendant's Memorandum in Opposition to Plaintiff's Motion in Limine to Limit Testimony of David Nieman, Ph.D. ("Defendant's Opposition to First Motion in Limine"), Docket at 67. In its opposition brief, CSX begins by discussing in detail Nieman's professional accomplishments. *Id.*, pp. 1-2. These accomplishments are many as far as the study of physiology, health, and "exercise science" are concerned, and Wilcox does not dispute them. For purposes of the court's current ruling on the motion in limine, Nieman's professional achievements (which are not in dispute) need not be reiterated in this Order.[4]

CSX argues that even though Nieman is not a medical doctor, he is nonetheless "qualified to offer opinions regarding the causes of plantar faciitis." *Id.*, p. 2. CSX states that "Dr. Nieman[5] does not intend to testify to any medical diagnoses. He also does not intend to testify to the specific cause of Plaintiff's plantar faciitis. Dr. Nieman will testify that an exhaustive review of the medical literature does not provide scientific evidence that plantar faciitis is related to Plaintiff's work activities, or that plantar faciitis can be caused by walking on mainline ballast." *Id.*, p. 3. CSX goes on to state that "Dr. Nieman will testify that he conducted

---

[4] In all four of the motions in limine currently before the court, neither party challenges the other party's proposed expert on the basis that the witness does not qualify as an expert. That is, the motions do not challenge any proposed expert's professional qualifications. Rather, the challenges are directed at the scientific or medical methodology (or alleged lack thereof) used by the experts to reach their respective opinions.

[5] Again, the parties do not dispute that Nieman does *not* have a medical degree. While CSX refers to Nieman as "Dr. Nieman," the prefix clearly refers only to Nieman's Ph.D. degree. Wilcox likewise refers to one of his experts as "Dr. Andres," although Andres also holds a doctorate and is not an M.D.

an exhaustive review of the medical literature using PubMed (government internet program that accesses medical literature in the National Library of Medicine), and searched for articles on the relationship between physical activity and foot pain, in particular plantar faciitis.  Based on his review of Plaintiff's work activities and the medical literature, Dr. Nieman has concluded that heel pain and other types of foot pain are not related to the described work activities at the railroad."  *Id.*, pp. 3-4.  Accordingly, CSX contends that Nieman should be permitted to offer expert opinion testimony regarding "the state of the literature and research . . . ."  *Id*

CSX does not discuss much about Nieman's "scientific methodology," whether any such methodology is based on accepted scientific principles, or the extent to which it has been subjected to peer review.  Still, after stating that Nieman's testimony would be limited to the state of medical literature as it pertains to plantar faciitis, CSX (perhaps inartfully) states that Nieman "has *concluded* that heel pain and other types of foot pain *are not related to the described work activities* at the railroad."  *Id.*, p. 4 (emphasis added).  It is difficult for the court to understand how research of an topic on an internet medical website can result in a "conclusion" regarding a particular plaintiff's alleged injuries, notwithstanding Nieman's undisputed expertise in physiology and/or health science.  More to the point, CSX does not present a sufficient legal argument, or cite sufficient legal authority,[6] to support its contention that Nieman should be allowed to refute the testimony of medical doctors on the crucial issue of the cause of plaintiff's alleged injuries.

---

[6] As Wilcox points out, many of the cases cited by CSX involve the admissibility of testimony by bio-mechanical engineers on the issue of the cause of a vehicle accident relative to accident reconstruction.  The cases do not involve the admission of testimony regarding medical conditions and/or causes by non-physicians.  *See* Plaintiff's Reply Brief, Docket at 68, p. 2.

CSX also states in its opposition brief that "Dr. Nieman is qualified to offer opinions rebutting any opinions regarding the state of the medical and scientific literature" concerning the topic of plantar faciitis and its causes. *Id.*, p. 6. CSX contends that in their depositions, plaintiff's physicians "testified to a belief that medical and scientific literature exists to support" their opinions that plaintiff's injuries were the result of his work. *Id.* However, says CSX, those physicians were unable to identify any such literature. *Id.* According to CSX, since Nieman has conducted research and determined that "no such literature exists," he should be allowed to testify about that in order to rebut the opinions of plaintiff's medical experts.

This argument is running pretty far afield. First, Wilcox's motion does not seek to bar Nieman's testimony on this limited point, at least not expressly. Assuming, for the sake of argument, that any of plaintiff's medical experts testify that such literature exists and/or that the expert relied on such literature to reach his or her conclusions, then the court would permit Nieman's testimony on this limited point as rebuttal testimony. This does not mean that the court would permit Nieman to offer any opinion about the cause of plaintiff's injuries, or to opine on whether walking on large ballast could result in such a type of injury. Rather, Nieman might be permitted to testify regarding his research of medical literature and, more specifically, whether such published medical literature exists. In this hypothetical event, the issue would be the weight and sufficiency of Nieman's testimony, not its admissibility. He is clearly qualified to conduct research on the issue of foot injuries in general and plantar faciitis in particular, and testify as to what he found. But that would be the extent of any such testimony if it is ultimately proffered and admitted.

Wilcox also takes issue with the possibility that Nieman would offer testimony

challenging Wilcox's assertion that he walked anywhere between three and 10 miles per day while working for CSX.  Wilcox argues that "Nieman testified that he found these distances to be 'highly improbable.' . . . He bases this opinion on the distances he witnessed during 5 hours of site inspections in North and South Carolina on two occasions.  These site inspections were conducted during investigation of other lawsuits against other railroads.  Further, [Nieman] relies on an unidentified and unproduced 'analysis' which allegedly depicted that brakemen and conductors actually walked only 60 minutes per day."  Plaintiff's First Motion in Limine, p. 9 (citing portions of Exhibit B thereto, Nieman Deposition).

CSX, on the other hand, argues that "[i]t is Dr. Nieman's opinion, as an exercise physiologist, that based upon his review of workers doing similar jobs at other locations, his experience in other lawsuits reviewing the amount of time railroad workers spent walking, and Plaintiff's obesity, that it is improbable that Plaintiff walked that far each day."  Defendant's Opposition to First Motion in Limine, p. 7.  Because he is an "exercise physiologist," CSX claims that Nieman is qualified to testify that it is "highly unlikely that an obese man could walk approximately 50 to 60 miles per week and remain obese."  *Id.*  However, CSX does not explain how personal observations of other railroad operations constitute "scientific methodology."  In addition, Nieman is not a physician, has never conducted a physical examination of plaintiff, and does not profess to have personal knowledge of plaintiff's lifestyle.  Therefore, his "conclusion" that it is "unlikely" that Wilcox walked three to ten miles each day constitutes speculation, not an expert opinion based on scientific methodology.  As such, Nieman will not be permitted to testify concerning this opinion.

Finally, CSX contends that "the amount of walking is relevant to Plaintiff's credibility.

If Plaintiff is exaggerating the time spent walking, his credibility becomes an issue in the case."
*Id.*  Therefore, argues CSX, Nieman should be permitted to testify about his opinions concerning
how much walking Wilcox actually did during his employment.  Wilcox retorts that "this
opinion is speculative and based upon inadequate foundation."  Plaintiff's Reply, p. 5.  Wilcox
argues that during his deposition, Nieman admitted that he knew "nothing about Plaintiff's job as
a 'utility brakeman' at [the] Garrett yard . . . has never seen Plaintiff work . . . has never seen a
'utility brakeman' at Garrett work . . . [and] has no idea what a utility brakeman does in general."
*Id.* (citing Exhibit B, Nieman Deposition, pp. 25, 28-30, 33-34).  Indeed, Nieman did make these
concessions during his deposition testimony.[7]

Even assuming that Wilcox's credibility becomes an issue on this point, as CSX claims it
may, that does not mean that Nieman's opinion would be admissible as expert testimony.
Nieman conceded that he never personally observed Wilcox at work, never observed workers at
all at CSX's Garrett facility, and based his conclusion at least in part on calculations contained in
a report prepared by someone other than himself (see footnote 7 below).  Nieman's curriculum
vitae, no matter how impressive, is insufficient to qualify him as an expert on the subject of the
amount of walking Wilcox did during his employment.  He has no personal knowledge of how
much walking Wilcox did, and apparently has no admissible evidence–let alone "scientific"
evidence–that would assist a jury in making such a factual determination.  Also, it would seem

---

[7] Nieman also stated in his deposition that he did not personally make any calculations
regarding how much walking the brakemen or conductors did during his observations of other
railroad yards.  Plaintiff's First Motion in Limine, Exhibit B, Nieman Deposition, p. 29.  Instead,
Nieman testified that he had "in my files an analysis that was done in another case, it wasn't
done by myself, but by someone else, where they did measure the actual amount of walking that
a conductor/brakeman would do in a given day.  And they ended up that the average usually fell
between 30 and 60 minutes . . . ."  *Id.*

logical that this issue, if it becomes an issue, could be easily resolved by calling to the stand one or two other brakemen/conductors for very brief testimony regarding the amount of walking their jobs demand.  The court fails to see why it would be necessary to call an "expert" witness to testify on this point.

Finally, Wilcox argues that Nieman should be prevented from offering any opinion testimony that Wilcox "possessed the 'risk factor' of limited or restricted dorsi-flexion of the foot and/or ankle prior to his diagnosis of plantar faciitis."  Plaintiff's First Motion in Limine, p. 2.[8]  Wilcox points out that Nieman testified during his deposition that he "did not know whether Plaintiff's limited dorsi-flexion existed prior to his diagnosis of plantar faciitis[.]" and that "Nieman also cannot rule out that the fact that Plaintiff's limited dorsi-flexion may have been caused by the plantar faciitis itself."  *Id.*, p. 11 (citing Exhibit B, Neiman Deposition, pp. 75, 71 and 73).  Rather, Nieman testified that he reviewed Wilcox's medical records and formed the opinion that Wilcox's plantar faciitis may have been caused by a preexisting medical condition.  *Id.*

CSX counters that Nieman, based on his areas of expertise and his research, should be allowed to testify "that limited ankle dorsi-flexion is a risk factor for plantar faciitis."  Defendant's Opposition to First Motion in Limine, p. 9.  Wilcox retorts that there is no evidence in the present case that Wilcox had limited dorsi-flexion prior to being diagnosed with and treated for plantar faciitis.  Plaintiff's Reply, p. 5.  This point is apparently uncontested, as both sides concede that there are no medical records (at least none discovered at this point) that

---

[8]  According to CSX, limited ankle dorsi-flexion is a limited "ability to lift the toes upward with the heel stable."  Defendant's Opposition to First Motion in Limine, p. 8.

indicate that Wilcox had this condition prior to the onset of his plantar faciitis.  Therefore, argues Wilcox, Nieman should be prevented from offering any expert opinion as to whether Wilcox's plantar faciitis could have been caused by preexisting limited dorsi-flexion.

What the court *will* permit Nieman to testify to is his knowledge of the causes of plantar faciitis in general.  That is, he may testify about the ways in which an individual may develop the condition or, more precisely, the body mechanics or risk factors that can lead to the condition. He cannot, however, offer any opinion regarding the cause of Wilcox's particular condition nor may he offer speculative testimony on the cause of Wilcox's condition.  To this extent, Wilcox does not oppose Nieman's testimony.  *See* Plaintiff's Memorandum in Support of Motion in Limine to Limit the Testimony of Stephen Messier, Ph.D., Pursuant to Fed.R.Evid. 702 ("Plaintiff's Second Motion in Limine"), p. 6 (Nieman and Messier "may be qualified . . . to testify to what the risk factors for plantar faciitis are, [but] cannot take the next step and testify to a medical cause of that condition.").  The court agrees that this is the sound approach.

For all of the reasons just discussed, the motion in limine filed by Wilcox to limit the testimony of David Nieman is GRANTED in part and DENIED in part.  Nieman will be permitted to testify within the parameters set forth herein.

**IV.  PLAINTIFF'S MOTION TO LIMIT THE TESTIMONY OF STEPHEN MESSIER, PH.D.**

Wilcox also seeks to limit the testimony of Stephen Messier, another of defendant's designated experts.  Wilcox claims that Messier, a professor of health science at Wake Forest University who, like Nieman, holds a doctorate, will offer testimony that is very similar, if not identical, to that proposed by Nieman.  And Wilcox raises most of the same arguments for excluding Messier's testimony that he did in relation to Nieman.

Wilcox moves the court to bar Messier from testifying to: "[1] Any biomechanical 'risk factor' opinions which are cumulative to those of David Nieman; [2] Any opinion relating to the medical 'cause' of Plaintiff's injuries; and [3] Any opinion stating Plaintiff's plantar faciitis is caused by obesity."  Plaintiff's Memorandum in Support of Motion in Limine to Limit the Testimony of Stephen Messier, Ph.D., Pursuant to Fed.R.Evid. 702 ("Plaintiff's Second Motion in Limine"), Docket at 55, p. 7.

Messier is "a Professor of Health and Exercise Science and Director of the J.B.Snow Biomechanics Laboratory at Wake Forest University[.]" Defendant's Memorandum in Opposition to Plaintiff's Motion in Limine to Limit Testimony of Stephen Messier, Ph.D. ("Defendant's Opposition to Second Motion in Limine"), Docket at 66, p. 2.  Messier's educational background and professional credentials, like those of Nieman, are not contested, and are listed in detail in CSX's brief at pages 2-3.  And, for the same reasons set forth in the court's discussion of Nieman's proposed testimony, it is not necessary to reiterate Messier's qualifications and accomplishments in this Order.  CSX argues that Messier should be permitted to testify essentially without restriction, including testimony regarding the likely causes of Wilcox's condition.  Specifically, CSX claims that Messier should be allowed to testify as to the causes of plantar faciitis because "[a]s a biomechanical engineer and clinical trials researcher,

Dr. Messier studies and researches the causes of medical conditions, including overuse injuries and plantar faciitis. . . . It could be said that Dr. Messier is more qualified than a 'medical doctor' in offering causation opinions because Messier has reviewed, and is more familiar with, the available medical literature on plantar faciitis and its causes, and Dr. Messier has actually conducted studies on the subject matter of his testimony." *Id.*, p. 6.

As was discussed above in relation to Nieman's proposed testimony, the court will permit Messier to testify as to the general causes and risk factors for plantar faciitis. However, Messier, like Nieman, will not be permitted to offer opinion testimony about the specific cause of Wilcox's condition. As for Wilcox's contention that Messier's testimony should be excluded to the extent that it will be cumulative to the testimony of Nieman, that portion of Wilcox's motion in limine will be denied at this point. The decision whether to admit cumulative evidence, as well as the determination of what evidence is, in fact, cumulative, lies within the sound discretion of the trial court. *United States v. Gardner*, 211 F.3d 1049, 1055 (7th Cir. 2000). Rule 403 of the Federal Rules of Evidence states that evidence may be excluded if "its probative value is substantially outweighed [by] the needless presentation of cumulative evidence." Fed.R.Evid. 403. In the present case, the court cannot, based on the current state of the record, conclude that Messier's testimony should be excluded on the grounds that it is needlessly cumulative. Indeed, it appears that there is some substantial overlapping (i.e., cumulative effect) in the testimony to be offered by Nieman and Messier. However, the testimony of both experts is already being substantially limited by the court, since neither will be permitted to testify about their opinions as to the cause of Wilcox's medical condition. On the other hand, both witnesses will be permitted to testify about the condition known as plantar faciitis, its generally acknowledged

24

causes and risk factors, and the results of studies they may have conducted on the condition.  But

the fact that testimony is potentially cumulative does not mean that it is barred automatically.

Many times, as here, the determination of whether any evidence should be precluded because it

is needlessly cumulative can only be made at the time of trial.  During the trial of this case,

should the court conclude that testimony regarding the general condition of plantar faciitis and

its causes and risk factors is unduly cumulative, the court may preclude the testimony of

*any* expert testifying on that issue.  For purposes of this Order, however, Messier will be

permitted to testify in the limited manner outlined above.  Accordingly, the motion in limine to

limit the testimony of Stephen Messier is GRANTED in part and DENIED in part.

### V.  DEFENDANT'S MOTION IN LIMINE TO EXCLUDE THE TESTIMONY OF ROBERT ANDRES AND RODNEY STUCK, M.D.

CSX has also filed a motion in limine in this case.  In its motion, CSX seeks to exclude,

*in toto*, any testimony from two of plaintiff's experts: Robert Andres and Rodney Stuck.[9]

Andres is "a bioengineer and ergonomist" whom Wilcox will call "to testify concerning the

ergonomic risk factors of walking on large ballast."  Plaintiff's Response to Defendant's Motion

to Exclude Testimony of Dr. Robert Andres ("Plaintiff's Response to Motion in Limine"),

Docket at 64, p. 2.  Rodney Stuck is a medical doctor who was retained by Wilcox and who

conducted an independent medical exam of the plaintiff.  *Id.*, p. 6.  CSX argues that both men

---

[9] Between them, the parties have listed several physicians as witnesses in this case. Therefore, the court is convinced that there will be no shortage of expert witnesses who will be qualified to testify as to the medical cause of plaintiff's plantar faciitis.  Both sides will have adequate opportunity to present expert testimony on that point, through both direct testimony and cross-examination.  In that respect, permitting Nieman, Messier and/or Andres to testify on that subject would also be needlessly cumulative.

should be barred from testifying.  As to Andres, CSX argues that his testimony "should be excluded because his study is irrelevant to this lawsuit and would be confusing to a jury, rather than helpful, and his study is not substantially similar to plaintiff's working conditions." Defendant's Memorandum in Support of its Motion to Exclude the Opinions of Robert Andres and Rodney Stuck, M.D. ("Defendant's Motion in Limine"), Docket at 59, p. 4.  As to Dr. Stuck, CSX argues that his medical opinions "should be excluded under Rule 702 as they are unreliable and speculative, and under Rule 402 as they are irrelevant."  *Id.*, p. 9

CSX claims that "[i]n 2000, Dr. Andres conducted what he labeled a 'preliminary' study of walking on ballast."  *Id.*, p. 3 (quoting from Exhibit C, Andres Deposition, p. 41).  CSX states that this study was conducted in Andres's garage and "involved five subjects walking in high top work boots . . . over a tray of 'yard' ballast tilted at a 7 degree angle, and over a tray of 'mainline' ballast tilted at a 7 degree angle."  *Id.*  Apparently this study resulted in the publication of an article titled "Impact of Railroad Ballast Type on Frontal Plane Ankle Kinematics During Walking."  *Id.*  CSX takes issue with the manner in which this study was conducted and challenges the conclusions arrived at by Andres.  CSX also takes issue with what it claims is Andres's opinion that CSX "was negligent for not having what he deems an 'appropriate medical management program' or 'comprehensive ergonomic program.'"  *Id.*, p. 4. Therefore, CSX moves the court to bar any testimony from Andres.

The crux of CSX's objection to the study conducted by Andres is that it was technically flawed in various respects, and that it was not representative of Wilcox's actual work conditions

26

(i.e., that it was simply "experimental").  *Id.*, pp. 4-7.[10]  (CSX also presents detailed argument

regarding what it considers the flaws of Andres's study in is reply brief, and it is not necessary

for the court to reproduce all of that argument and evidence herein.  *See* Defendant's Reply

Memorandum in Support of its Motion to Exclude the Opinions of Robert Andres ("Defendant's

Reply"), Docket at 72, pp. 2-7.))  CSX also argues that Andres's conclusion that CSX was

negligent because it did not have a "medical management program" in place during Wilcox's

employment is irrelevant because "[n]o expert in this case, including Dr. Andres, will testify that

a lack of an 'appropriate medical management program' or a 'comprehensive ergonomic

program' caused Plaintiff to develop plantar faciitis.  Because there is no link between this

alleged negligence and Plaintiff's plantar faciitis, his opinions are irrelevant and should be

excluded."  *Id.*, p. 9.  In support of this position, CSX points out that Andres himself testified

during his deposition that it could not be said with certainty that such a program would have

prevented Wilcox's injury.  *Id.* (Exhibit C, Andres Deposition, p. 128).

Wilcox argues that Andres should not be barred from testifying.  Wilcox claims that

"[t]he areas on which Dr. Andres offers opinions are not within the common knowledge and

expertise of layperson[s] and [the] testimony will be helpful."  Plaintiff's Response to Motion in

Limine, p. 4.  In many respects, Wilcox makes the same arguments for the admission of the

testimony of Andres as CSX did with respect to Nieman and Messier.  It is undisputed that none

of these three men are physicians, but rather, scholars and researchers in some area of health

---

[10]  CSX also points out that a state court in Virginia, in an FELA case very similar to the present case, excluded any testimony by Andres or the admission of the article he wrote following his 2000 study, on the grounds that the evidence was irrelevant and would not aid the jury.  *Id.*, p. 7.  CSX attached a copy of that state court's unpublished opinion to its memorandum as Exhibit E.

science, ergonomics, or biomechanics.  The court's conclusion with respect to the proposed

testimony of Andres is the same as it is for Nieman and Messier.  That is, Andres will be

permitted to testify in a general sense about his knowledge and expertise as to the causes and risk

factors of plantar faciitis.[11]  CSX's objections to the methodology and conclusions of Andres's

study, especially the argument that it was not intended to duplicate or represent Wilcox's actual

working conditions, are well taken.  Andres may testify about this study, how it was conducted,

and what the results were, but he may not state that he reached any opinion about Wilcox's

condition based on that study.

As to Andres's opinion that CSX was negligent due to its failure to have some sort of

medical management program or ergonomic program in place for its employees, that opinion

will not be admitted as evidence.  As CSX points out, there is no evidence in the case that the

lack of such a program proximately caused Wilcox's alleged injuries.  Furthermore, Andres

admitted in his deposition that he could not say with any degree of certainty that having such a

program in place would have prevented Wilcox's condition.  The real issue in this case, at least

as to Count I of plaintiff's Complaint, is whether CSX was negligent in any way with regard to

---

[11]  In its reply brief, CSX notes that "Plaintiff cites a number of cases where Dr. Andres was permitted to testify to 'risk factors' for various conditions and/or survived *Daubert* challenges.  It may well be that Dr. Andres's testimony regarding risk factors would be relevant and admissible in a case where there is evidence that those risk factors can cause and did cause the medical condition at issue.  But, in this case, there is no such evidence.  Dr. Andres cannot link his findings to the development of plantar faciitis."  Defendant's Reply, p. 5, n. 1.  This is an interesting contention, since CSX intends to present its own health science experts, Nieman and Messier, to testify as to the risk factors associated with plantar faciitis.  In any event, none of these three experts will be permitted to offer opinion testimony concerning the alleged cause of Wilcox's condition, but all three will be permitted to testify about their study and knowledge of the various risk factors for plantar faciitis in general.  The fact that Andres's opinions may differ with those of Nieman and Messier is not a valid basis for excluding his testimony, as CSX requests.

the type of ballast it used at the site where Wilcox was employed.  The issue is not whether CSX should have had a medical management program or ergonomic program in place.  Permitting Andres to offer his opinion on this issue could confuse a jury and possible lead a jury to wrongfully conclude that the lack of such a program necessitates a finding of negligence against defendant, regardless of the jury's finding on the ballast issue.  For all of these reasons, the motion in limine to exclude the testimony of Robert Andres filed by CSX is GRANTED in part and DENIED in part.  Andres, like Neiman and Messier, may testify as an expert, within the parameters set forth in this Order.

Finally, there is the issue of the testimony of Rodney Stuck, M.D.[12]  CSX contends in its briefing that Dr. Stuck's medical opinions should be excluded because they are "unreliable and speculative."  Defendant's Motion in Limine, p. 11.  CSX bases this contention on the argument that "Dr. Stuck is not able, and was not able, to determine that the use of 'yard' ballast would have made any difference at all in Plaintiff's condition[.]" *Id.*, p. 17.  CSX then quotes passages from Dr. Stuck's deposition in which he testified that "in some respects it may not have mattered" what size ballast Wilcox walked on during the course of his employment.  *Id.* (quoting Exhibit F, Stuck Deposition, pp. 57-58).  CSX claims that this passage (among some others) indicates that Dr. Stuck's ultimate conclusion that the use of large ballast contributed to Wilcox's alleged injuries is "unreliable," "irrelevant," and should be excluded.  CSX argues that "Dr. Stuck has insufficient knowledge of the difference between 'yard' ballast and 'mainline'

---

[12]  Dr. Stuck is "a doctor of podiatric medicine who is a member of the Department of Orthopaedic Surgery and Rehabilitation at Loyola University Medical Center."  Plaintiff's Response to Motion in Limine, p. 3.  He was retained by the plaintiff to conduct an independent medical exam of the plaintiff and issue an opinion in this case.  *Id.*, p. 4.

ballast to allow him to opine that walking on 'mainline' ballast caused Plaintiff to . . . develop bilateral plantar faciitis." *Id.*, p. 11. While it is true that Dr. Stuck testified in his deposition that he did not personally take measurements of the ballast in question and that he did not know the exact size of the ballast on which Wilcox worked, CSX makes a leap of faith by arguing that this testimony renders all of Dr. Stuck's opinions and conclusions irrelevant and unreliable. The court's reading of the deposition excerpts indicates that Dr. Stuck was basing his opinion less on the size of the ballast and more on the fact that Wilcox worked on an "uneven" walking surface. *See, e.g.,* Defendant's Exhibit F, Stuck Deposition, pp. 42-43. In any event, the degree to which Dr. Stuck was familiar with the actual surface on which Wilcox walked is an issue that goes to the weight of his testimony rather than its admissibility.

In addition to that challenge to Dr. Stuck's testimony, CSX attacks with a much broader brush by arguing that Dr. Stuck "employed no methodology in forming his opinion" and that his opinion "is not the result of any scientific enterprise, but rather, the result of pure speculation . . . ." Defendant's Motion in Limine, p. 14. If this were truly the case, the inquiry would end there, and Dr. Stuck's testimony would clearly be ruled inadmissible. But the evidence before the court undermines that argument.

For example, Wilcox counters CSX's arguments by stating that Dr. Stuck reviewed Wilcox's medical records pertaining to this case, personally took a medical history from the plaintiff, and personally conducted a physical examination of the plaintiff. Plaintiff's Response to Motion in Limine, pp. 1-2. Wilcox also maintains that Dr. Stuck formed an opinion "to a reasonable degree of podiatric medical certainty that Plaintiff's plantar faciitis is causally related to large ballast conditions which Plaintiff was exposed to at work." *Id.*, p. 2. Wilcox contends

30

that CSX's objections to the proposed testimony of Dr. Stuck "only goes to the weight of his testimony, not to the admissibility of said testimony." *Id.* Wilcox is correct.

The Seventh Circuit has recognized that expert testimony may be admissible under Rule 702 and *Daubert* notwithstanding that it might also be "subject to doubt." In *Cooper v. Carl A. Nelson Co.*, 211 F.3d 1008 (7th Cir. 2000), the trial court sustained the defendant company's objections to the introduction of evidence from a physician who conducted in independent medical exam of the plaintiff and precluded that expert's testimony. The court of appeals reversed that decision. The physician, Dr. Richardson, had formed an opinion that the pain about which plaintiff complained was the result of an on-the-job accident. This opinion was based on a physical examination of the plaintiff and, especially, on the personal statements the plaintiff made to Dr. Richardson concerning his medical history. The defendant argued, and the trial court agreed, that this was an inadequate basis for forming such a medical opinion, i.e., that it lack any scientific methodology.

In reversing, the appellate court noted first that a physical examination of a patient, coupled with the consideration of the patient's own recitation of his medical history, is an "accepted diagnostic tool" and constituted a "methodology . . . acceptable under the gatekeeping requirements of *Daubert*." *Cooper*, 211 F.3d at 1021. The court further explained its holding as follows:

> The possibility of [the plaintiff's condition] being attributable to a factor other than the fall is a subject quite susceptible to exploration on cross-examination by opposing counsel. Similarly, the accuracy and truthfulness of the underlying medical history is subject to meaningful exploration on cross-examination and ultimately to jury evaluation. Therefore, [defendant's] contention that other conditions of [plaintiff's] might have caused his [condition] goes to the weight of the medical testimony, not its admissibility.

. . .

> The proper method of attacking evidence that is admissible but subject to doubt is to cross-examine vigorously, to present contrary evidence, and to give careful instructions on the burden of proof. *Daubert* acknowledged the continuing vital role that "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof, . . . are to play in the trier of fact's ultimate evaluation of admissible but shaky evidence."

*Id.*, (quoting *Daubert*, 509 U.S. at 596) (additional internal citations omitted).

For all of the extensive briefing and argument regarding the admissibility of Dr. Stuck's testimony, it is clear to the court that the issues concerning his testimony go to its weight and not to its admissibility under Fed.R.Evid. 702 or *Daubert*. The testimony of physicians who conduct independent medical exams in personal injury cases is widely accepted and generally always admissible. While CSX takes issue with the manner in which Dr. Stuck arrived at his conclusion in this case, that is an issue more properly addressed in cross-examination and/or by the presentation of the testimony of defendant's own independent expert, not by the exclusion of Dr. Stuck's testimony altogether. Therefore, defendant's motion in limine to exclude the testimony of Dr. Stuck is DENIED.

**CONCLUSION**

For the reasons discussed in this Order, the motion for summary judgment filed by defendant CSX is DENIED; the motion in limine filed by plaintiff to limit the testimony of David Nieman is GRANTED in part and DENIED in part; the motion in limine filed by plaintiff to limit the testimony of Stephen Messier is GRANTED in part and DENIED in part; the motion in limine filed by defendant to exclude the testimony of Robert Andres and Rodney Stuck is GRANTED in part and DENIED in part as to Andres, and DENIED as to Stuck.

Dated: May 30, 2007.

  /s/  William C. Lee
William C. Lee, Judge
United States District Court
Northern District of Indiana